59 F.3d 969
 64 USLW 2099, 33 Collier Bankr.Cas.2d 1778,
27 Bankr.Ct.Dec. 623, Bankr. L. Rep. P 76,554,
95 Daily Journal D.A.R. 9202
 In re POWERINE OIL COMPANY, Debtor.
COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS, Appellant,
v.
KOCH OIL COMPANY, Appellee.
 No. 92-56077.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 7, 1994.
Decided July 12, 1995.
 
 Thomas A. Ryan, David Gould (argued), McDermott, Will & Emery, Los Angeles, CA, for appellant.
 Michael R. Hassan, Lord, Bissell & Brook, Chicago, IL, for appellee.
 Appeal from the Ninth Circuit Bankruptcy Appellate Panel Ollason, Jones, and Perris, Bankruptcy Judges, Presiding.
 Before: FARRIS, POOLE and KOZINSKI, Circuit Judges.
 Opinion by Judge KOZINSKI; Dissent by Judge FARRIS.
 KOZINSKI, Circuit Judge.
 
 
 1
 Can an unsecured creditor be better off when the debtor defaults rather than paying off the debt? Yes: Law can be stranger than fiction in the Preference Zone.
 
 
 2
 * Powerine Oil Company (the debtor here) obtained a $250.6 million line of credit from a syndicate consisting of several banks and insurance companies; the loan was secured by most of Powerine's personal property. The security agreement provided that the collateral would serve as security for all letters of credit that "have been, or are in the future, issued on the account of Debtor." ER 101-02.
 
 
 3
 Koch Oil Company thereafter agreed to sell crude oil to Powerine. To secure Powerine's obligation, it designated Koch as beneficiary of two irrevocable standby letters of credit issued by First National Bank of Chicago, one of the lenders covered by the security agreement. The letters, which were to expire in April 1984, totaled approximately $8.7 million, an amount at all times sufficient to cover the cost of the oil Koch sold to Powerine.
 
 
 4
 In January and February 1984, Koch billed Powerine $3.2 million for oil it had delivered in December and January. Powerine eventually paid this amount but, unfortunately for Koch, it also filed a chapter 11 bankruptcy petition less than 90 days later. The Committee of Creditors Holding Unsecured Claims (the Committee) eventually brought an action to recover the payment, claiming it was a preference under 11 U.S.C. Sec. 547(b).[1]
 
 
 5
 The bankruptcy court held that the transfer was protected by the "contemporaneous exchange for new value" exception of 11 U.S.C. Sec. 547(c)(1) and granted Koch's motion for summary judgment. The Bankruptcy Appellate Panel (BAP) affirmed on a different ground: It held that the payment wasn't a preference because it didn't enable Koch to recover more than it would in a chapter 7 liquidation. Even if Powerine hadn't made the $3.2 million transfer, the BAP reasoned, Koch would have been paid in full because it would have drawn on First National's letters of credit.
 
 II
 
 6
 Bankruptcy Code section 547(b) sets forth the five elements of a preferential transfer.[2] The parties dispute only whether the last element--section 547(b)(5)--was satisfied here. Under this provision, the Committee must prove that Koch "received more than it would [have] if the case were a chapter 7 liquidation case, the transfer had not been made, and [Koch] received payment of the debt to the extent provided by the provisions of the Code." 4 Collier on Bankruptcy p 547.08, at 547-45 (Lawrence P. King ed., 15th ed. 1995).
 
 
 7
 Whether section 547(b)(5)'s requirements have been met turns in part on the status of the creditor to whom the transfer was made. Pre-petition payments to a fully secured creditor generally "will not be considered preferential because the creditor would not receive more than in a chapter 7 liquidation." Id. at 547-47. With respect to unsecured creditors, however, the rule is quite different: "[A]s long as the distribution in bankruptcy is less than one-hundred percent, any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made." In re Lewis W. Shurtleff, Inc., 778 F.2d 1416, 1421 (9th Cir.1985).
 
 
 8
 Vis-a-vis Powerine, Koch was an unsecured creditor as it didn't hold any security interest in Powerine's property. See 11 U.S.C. Sec. 506(a). Because most of Powerine's assets on the date it filed for bankruptcy were subject to the lien held by the secured creditors, Powerine's unsecured creditors could expect to receive much less than one-hundred cents on the dollar in a chapter 7 liquidation. Consequently, Powerine's $3.2 million pre-petition payment enabled Koch to recover more than it would have in a chapter 7 liquidation, and it was therefore a preference.
 
 
 9
 The BAP came to the contrary conclusion by focusing on the fact that Koch could have drawn down the letters of credit, had Powerine not paid it directly. Since Koch would have recovered the full amount owed to it (albeit from First National) had Powerine defaulted, the BAP reasoned that the $3.2 million payment wasn't a preference.
 
 
 10
 Courts have long held, however, that the key factor in determining whether a payment is a preference is the "percentage[ ] ... [creditors'] claims are entitled to draw out of the estate of the bankrupt." Swarts v. Fourth Nat'l Bank, 117 F. 1, 7 (8th Cir.1902) (emphasis added). Thus, the relevant inquiry focuses "not on whether a creditor may have recovered all of the monies owed by the debtor from any source whatsoever, but instead upon whether the creditor would have received less than a 100% payout" from the debtor's estate. In re Virginia-Carolina Fin. Corp., 954 F.2d 193, 199 (4th Cir.1992); see also In re Formed Tubes, Inc., 41 B.R. 819, 821-22 (Bankr.E.D.Mich.1984). That Koch had recourse against a third party in case the debtor defaulted thus has no bearing on this issue.
 
 
 11
 The BAP nonetheless invoked a "rule of reason" to avoid what it viewed as an inequitable result. ER 150. Koch's right to collect under the letters could be taken into account, the BAP held, because the letters of credit had expired by the time the Committee initiated its preference action. Koch was thus left far worse off because Powerine paid its bill rather than defaulting. The BAP recognized that a creditor's "rights against a surety are not relevant to whether a transfer is preferential so long as those rights are still in place after the preference action is commenced." It concluded, however, that "when that right of action against the surety no longer exists, it is incumbent upon the court to measure the net recovery that the transferee would have obtained from the surety had the transfer not been made." ER 150. The BAP cited no authority for this proposition and we construe it to have been an exercise of its equitable powers.
 
 
 12
 Although bankruptcy courts are sometimes referred to as courts of equity, the Supreme Court has reminded us that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988). Equity may not be invoked to defeat clear statutory language, nor to reach results inconsistent with the statutory scheme established by the Code. See In re Kelly, 841 F.2d 908, 913 n. 4 (9th Cir.1988); In re Shoreline Concrete Co., 831 F.2d 903, 905 (9th Cir.1987). Because the statutory language here provides no basis for the BAP's "rule of reason," we conclude that it was error to consider the right to draw on third-party letters of credit in deciding whether Koch had received a preference.
 
 III
 
 13
 Having determined that Powerine's $3.2 million payment to Koch was preferential under section 547(b), we must next determine whether any of section 547(c)'s exceptions apply. Placing heavy reliance on In re Fuel Oil Supply & Terminaling, Inc., 837 F.2d 224 (5th Cir.1988), Koch contends the payment it received is protected by the "contemporaneous exchange for new value" exception of 11 U.S.C. Sec. 547(c)(1).[3] In Fuel Oil, the debtor paid one of its unsecured creditors within 90 days of filing for bankruptcy. Like Koch, the creditor was the beneficiary of two letters of credit securing payment if the debtor defaulted. The issuing banks "held a security interest in [debtor]'s assets which at all times was equal to or in excess of [debtor]'s obligation to [the creditor]." Id. at 228.
 
 
 14
 The Fifth Circuit held that the payment was protected by the contemporaneous exchange for new value exception, reasoning that, when the debtor paid the creditor, the banks' exposure under the letters of credit was reduced by a corresponding amount. The banks' contingent reimbursement claim against the debtor's assets was thereby released, giving the debtor new value. "This outcome is consistent with the principle underlying Sec. 547(c)(1)," the Fifth Circuit noted, "because the release of the debtor's collateral offsets the transfer to the creditor, thereby resulting in no depletion to the debtor's estate." Id.; see also In re E.R. Fegert, Inc., 887 F.2d 955, 959 (9th Cir.1989).
 
 
 15
 Unlike the banks in Fuel Oil Supply, which were fully secured, however, First National was only partially secured. When Powerine filed for bankruptcy, it had $282 million in secured debt and assets of only $66 million. Nor did First National have first claim on the security because the loan agreement provided that Powerine's debts would be secured "equally without preference or priority of any one over the other." ER 101.
 
 
 16
 Only a portion of First National's contingent reimbursement claim was thus secured by the blanket lien. When Powerine paid Koch directly, First National's exposure under the letters of credit was reduced by a corresponding amount, and its contingent claim against Powerine's assets was thereby released, but only to the extent the claim was secured. Thus, Powerine received new value equal to the amount of the secured portion of First National's reimbursement claim. See In re Robinson Bros. Drilling, Inc., 877 F.2d 32, 33-34 (10th Cir.1989). As to the unsecured portion of First National's claim, however, Powerine didn't receive new value; the bank couldn't release a security interest in Powerine's assets it didn't in fact have. The contemporaneous exchange for new value exception therefore doesn't protect Koch's $3.2 million payment to the extent First National's reimbursement claim was unsecured.
 
 
 17
 * * * * * *
 
 
 18
 We are unable to determine on this record how much of First National's contingent reimbursement claim against Powerine was secured. We therefore remand for the bankruptcy court to determine what portion of the $3.2 million payment may be recovered from Koch.
 
 
 19
 REVERSED and REMANDED.
 
 FARRIS, Circuit Judge, dissenting:
 
 20
 Bankruptcy courts sit as courts of equity, but they may not avoid the plain language of a statute. In re Shoreline Concrete Co., 831 F.2d 903, 905 (9th Cir.1987). We must decide whether the Bankruptcy Appellate Panel's interpretation of 11 U.S.C. Sec. 547(b)(5) is plausible.
 
 Section 547(b)(5) states:
 
 21
 [T]he trustee may avoid any transfer of an interest of the debtor in property--
 
 
 22
 . . . . .
 
 
 23
 (5) that enables such creditor to receive more than such creditor would receive if--
 
 
 24
 (A) the case were a case under chapter 7 of this title;
 
 
 25
 (B) the transfer had not been made; and
 
 
 26
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 
 
 27
 The plain language of the statute does not limit consideration to funds from Powerine's estate. Under a hypothetical chapter 7 liquidation, it could have collected from First National as "provided by the provisions of this title." In its opinion, the BAP ruled that "[n]othing in title 11 would prevent a draw down on the credits here at issue had Powerine filed bankruptcy without paying Koch."
 
 
 28
 In my opinion, the BAP's decision does not avoid the plain language of section 547(b)(5). I respectfully dissent.
 
 
 
 [1]
 Pursuant to Powerine's reorganization plan, any preferential transfers recovered for the estate will be divided equally between secured and unsecured creditors. The full amount of the January and February payments was $8.5 million, but only $3.2 million was paid more than 45 days after delivery. We agree with the BAP that Powerine incurred its debts on the date Koch delivered the oil, not (as Koch argues) the first date the exact amount of the debt could be determined. Accordingly, $3.2 million of the transfer wasn't covered by the "ordinary course of business" exception under the version of 11 U.S.C. Sec. 547(c)(2) in effect at the time of the transfer. See In re Gold Coast Seed Co., 751 F.2d 1118, 1119 (9th Cir.1985)
 
 
 [2]
 Section 547(b) provides:
 Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made--
 (A) on or within 90 days before the date of the filing of the petition ...
 (5) that enables such creditor to receive more than such creditor would receive if--
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 11 U.S.C. Sec. 547(b) (1986).
 
 
 [3]
 Section 547(c)(1) provides:
 The trustee may not avoid under this section a transfer ... to the extent that such transfer was--
 (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
 (B) in fact a substantially contemporaneous exchange.
 11 U.S.C. Sec. 547(c)(1).